Mark E. Andrews (TX Bar No. 01253520)
Aaron M. Kaufman (TX Bar No. 24060067)
Jane Gerber (TX Bar No. 24092416)
**DYKEMA COX SMITH**
1717 Main Street, Suite 4200
Dallas, TX  75201
Phone: (214) 462-6400
Fax: (214) 462-6401
Email: mandrews@dykema.com
Email: akaufman@dykema.com
Email: jgerber@dykema.com

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** § § | **CHAPTER 11 CASE** | |
| **PREFERRED CARE PARTNERS MANAGEMENT GROUP, L.P,** § § § § | **CASE NO. 17-34296** | |
| **Debtor.** | | |
| **In re:** § § | **CHAPTER 11 CASE** | |
| **KENTUCKY PARTNERS MANAGEMENT, LLC,** § § § § | **CASE NO. 17-34267** | |
| **Debtors.** | | |

### DECLARATION OF TRAVIS EUGENE LUNCEFORD
### IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

**THE STATE OF TEXAS**            §
                                 §
**COUNTY  OF COLLIN**             §

I, Travis Eugene Lunceford, pursuant to 28 U.S.C § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.    My name is Travis Eugene Lunceford.  I am over the age of eighteen years of age, and am fully competent to make this Declaration.  I have never been convicted of a felony or crime of dishonesty or moral turpitude.

Case 17-34296-hdh11 Doc 9 Filed 11/13/17    Entered 11/13/17 19:36:52    Page 2 of 16

2. I am either an officer or a member of all three debtors in possession, which are: Preferred Care Partners Management Group, L.P. ("Management") and Kentucky Partners Management, LLC ("KPM" and, collectively, with Management, the "Debtors" or the "Management Debtors").

3. I have personal knowledge of the facts stated herein, or such facts are based on my review of the Debtors' operations, including the Debtors' books and records, and on the information and interviews conducted by me and my staff and professional advisors with the Debtors' officers and employees.

4. I submit this Declaration in support of the various motions discussed below (the "First Day Motions") that the Debtors are filing on or shortly after the commencement of the Cases on November 13, 2017 (the "Petition Date").

## I.   BACKGROUND

*A.   The Management Debtors*

5. The Management Debtors are equally managed by three individuals: Gary Anderson, Melinda Provence and myself (collectively, the "Managers").[1] For many years prior to the Debtors' formation, starting in the late 1980s and early 1990s, the founding members of Management had been employed by Preferred Care, Inc. or its various affiliates (collectively, "PCI" or the "Preferred Care Group").[2]

---

[1] Management was principally founded by the three above named Managers and Michael Tennyson, who was previously a manager of the Debtors. On November 3, 2017, Mr. Tennyson passed away, leaving the other three as the only remaining Managers. Prior to his passing, the four founding members owned the Debtors equally. As discussed below, the current ownership of the Debtors and their non-debtor affiliates remains open in light of a certain buy-sell agreement among the Debtors, the non-debtor affiliates and the individual owners.

[2] As detailed more fully in the first day declarations filed in connection with the Preferred Care Group's bankruptcy, the Preferred Care Group operates approximately one hundred and thirteen (113) skilled nursing, assisted living and independent living facilities (the "Facilities") in twelve (12) states (approximately 11,500 beds), with approximately 9,300 residents in the various Facilities, making the Preferred Care Group one of the largest nursing home chains in the United States.

DECLARATION OF GENE LUNCEFORD IN SUPPORT OF FIRST DAY MOTIONS - PAGE 2 OF 16
4841-0450-3890.4

6. In 2004, the Managers decided to leave the employ of Preferred Care Group to form a new venture. Through this new, separately-owned venture, Management would provide Preferred Care Group with consulting services to various skilled nursing, assisted living and independent living Facilities. Upon formation in 2004, Management entered into management agreements with each of the Facilities owned or operated by the Preferred Care Group at that time.

7. Initially, the ownership structure was as follows: The founding members (including Mr. Tennyson, Mr. Anderson, Ms. Provence and myself) each held 24% of the membership interests in PCPMG, LLC ("PCPMG"),[3] and Thomas Scott (the principal of PCI) originally owned the remaining 4% interest. PCPMG, in turn, owned 1% of Management (and was its general partner), and the remaining 99% of Management was held 24% by each of the Managers and 3% by Mr. Scott. In 2008, the Managers completed a buy-out of Mr. Scott's equity interest in PCPMG and Management, leaving the four Managers as the sole owners (and limited partners) of Management and PCPMG.[4]

8. At that time, in 2008, the founding members of Management formed a new entity (PCPMG-ICF, LLC) to manage certain intermediate care facilities that had been acquired by Preferred Care, Inc. and its affiliates. While PCPMG-ICF is an affiliate of the Debtors by common ownership, the facilities it manages are entirely separate from, and have nothing to do with, the various Facilities located in Kentucky and New Mexico. In fact, the formation of the

---

[3] PCPMG is presently the 4% owner of Management, as well as its general partner.

[4] The ownership remained unchanged from 2008 until Mr. Tennyson's recent passing. Pursuant to a certain *Amended and Restate Buy-Sell Agreement* among the Debtors, several of their non-debtor affiliates and the owners, the surviving owners became obligated to use certain life insurance policy proceeds to buy out Mr. Tennyson's ownership interests in the Debtors and their non-debtor affiliates. As of the Petition Date, the allocations of the insurance policy proceeds to complete this buy-out from Mr. Tennyson's widow were ongoing.

PCPMG-ICF entity was the Managers' first step toward reorganizing the Debtors, as discussed further below.

B.  *Historical Operations of the Debtors*

9.  Upon formation of Management in 2004, Management entered into management agreements with Preferred Care Group's existing Facilities. At the time of formation in 2004, the Preferred Care Group owned and operated a total of 14 facilities. Between 2004 and 2012, the number of facilities grew to approximately 74 facilities in Texas, Florida, Kansas, Iowa, Arizona, Mississippi, Nevada, Louisiana, Colorado and Oklahoma. For each new facility acquired by the Preferred Care Group, the Preferred Care Group entity with ownership of such facility would enter into a management agreement with Management, and Management would hire the personnel needed to provide the back-office, non-clinical support to the facility.

10. In a typical scenario, the Preferred Care Group may have maintained approximately 100 employees for a given facility. On the other hand, for every site Preferred Care Group operated, Management would allocate a requisite number of its *own* staff employees to provide periodic consulting facility personnel. Additionally, Management would supply personnel to provide the Facilities with accounting, human resources, insurance relationship, AR collection, and AP and vendor relations. Many of Management's employees serviced a particular region where such employees may be responsible for servicing multiple Preferred Care Group Facilities within that region. In addition to these on-site regional employees, Management employed a full-time staff at its corporate offices in Plano, Texas.[5]

11. The services provided by Management typically included negotiations with drug vendors and other material suppliers to obtain favorable rates for the benefit of the facilities. In

---

[5] As the result of the 2017 corporate reorganization (described below), the office leases were assumed by MCON (defined below). Accordingly, Management no longer has any rental or other obligations under such leases.

many instances, Management was (and in many cases, still is) a counterparty to such master supply agreements, but in such instances the financial obligations to pay for any good supplied to the facilities has always remained with the actual Preferred Care Group owner/operator of the facility.  To be clear, Management has never provided day-to-day patient care services to the Facilities.  Instead, Management's role was to provide consultation to the Preferred Care Group Facilities.

12. In exchange for the services provided under the management agreements between Management and the Preferred Care Group Facilities, Management was entitled to receive a percentage of the Facilities' gross revenues, initially 5% and later reduced to 4% by agreement between Management and the Preferred Care Group, in an effort to improve the profitability and patient care services to the Preferred Care Group Facilities.

C. *Pre-Petition Corporate Reorganization*

13. Due to the large-scale increases to the number of Facilities acquired by the Preferred Care Group between 2004 and 2012, Management was long overdue for a corporate reorganization to match the Preferred Care Group's special purpose entity structure for each facility.  To provide consistency and ease in marketing facilities in the future, Management determined that it would be preferable to maintain the management contracts within special purpose entities so that such agreements could be assumed, assigned, modified or terminated without substantial disruption to the management of other facilities, similar to the manner in which PCPMG-ICF had maintained its own contracts starting in 2008.  However, as of 2012, with the exception of a few PCPMG-ICF contracts, all 74 management agreements with the Preferred Care Group Facilities were still held within a single entity (Management).

14. In 2012, the Preferred Care Group acquired approximately 21 new Facilities in Kentucky and 12 new Facilities in New Mexico.  In an effort to continue the process of

Management's corporate reorganization, the Managers formed KPM to hold and service the 21 new management agreements with the Kentucky Facilities acquired by the Preferred Care Group.[6] Those new management agreements with KPM contained five-year terms, expiring on June 30, 2017.

15. In the summer of 2017, the Debtors completed their corporate restructuring. The need for efficiency in handing the 100+ management agreements with the Preferred Care Group Facilities, as well as the expiration of the five-year term under the KPM management agreements, were all motivating factors to complete this process. The result of the reorganization is summarized below:

    a) <u>PCPMG of Kentucky, LLC</u>. A new affiliate of Management was formed to hold ownership of 21 newly-formed special purpose entities for the Kentucky Facilities. Because the management agreements with the 21 Kentucky Facilities expired under their own terms on June 30, 2017, nothing was transferred to these new entities. Instead, the 21 Preferred Care Group Facilities in Kentucky entered into new management agreements with the 21 new subsidiaries of PCPMG of Kentucky, LLC. Because the old management agreements with KPM expired under their own terms, KPM no longer holds any significant assets or operations.

    b) <u>PCPMG of New Mexico, LLC</u>. Management formed a new Texas limited liability company, which is wholly owned by Management. PCPMG of New Mexico then formed several special purpose entities, as wholly owned subsidiaries of PCPMG of New Mexico. Those subsidiaries assumed Management's obligations under various amended and restated management agreements with the 12 or so Preferred Care Group Facilities in New Mexico. This occurred as part of the corporate restructuring that the Debtors completed in July of 2017.

    c) <u>Other Affiliates</u>. As part of this corporate restructuring, Management repeated the same task described above (with respect to the New Mexico Facilities) for all of the Facilities under management in other states, including those maintained in Arizona, Texas, Florida, Louisiana, Kansas, Iowa, Nevada, Colorado and Oklahoma.

    d) <u>PCPMG Consulting, LLC</u>. Prior to the corporate reorganization in the summer of 2017, Management employed approximately 180-190 individuals, both at their corporate offices in Plano, Texas, as well as in the various regions where Management provides services to Preferred Care Group Facilities. Historically, those employees serviced *all* Facilities, even though Management did not own the rights to all

---

[6] The remaining 12 agreements with the New Mexico facilities were executed with Management.

of the management agreements for the applicable Facilities (some were maintained through affiliates such as KPM and non-debtor affiliates such as PCPMG-ICF, LLC). In other words, Management held the obligations to all employees, but each affiliate (Management, KPM and PCPMG-ICF) maintained its own bank accounts. This system was inefficient, and Management sought to correct it through its corporate reorganization in the summer of 2017. As a result, Management formed a new wholly-owned subsidiary—PCPMG Consulting, LLC ("MCON"). Upon formation of MCON, Management contributed to MCON all of its cash on hand as of June 30, 2017, certain contracts, and all existing employees. In exchange, MCON assumed obligations and entered into agreements with Management concerning the accounting and maintenance of future cash receipts from the various management agreements, which were now held by each newly-formed special purpose entity.

D. *Events Leading to the Bankruptcy Filing*

16. The bankruptcy filings were necessitated by an overwhelming amount of personal injury litigation filed in Kentucky and New Mexico, primarily by one law firm, Wilkes & McHugh of Tampa, Florida ("Wilkes"). There are currently approximately 163 lawsuits pending against the Debtors, which were joined as co-defendants with Preferred Care, Inc. and/or the Preferred Care Group. Before the Petition Date, the Preferred Care Group provided a common defense for themselves and Management, KPM and PCPMG (pursuant to indemnification provisions in the Debtors' management agreements). The Debtors and PCPMG maintain that they are not proper parties in those lawsuits, and, to the best of my knowledge, that issue has not been squarely addressed to date. Of the 160+ lawsuits pending as of the Petition Date, approximately 97 lawsuits were pending in Kentucky and 27 were pending in New Mexico.

17. The future costs, expenses and potential exposure associated with defending the pending litigation has left the Debtors with limited resources. New Mexico does not have tort reform statutes, and Kentucky has only recently enacted a limited tort reform statute. The Debtors operating the Kentucky facilities have no professional liability insurance to cover tort claims. The Debtors operating the New Mexico facilities have limited professional liability insurance.

18. Making the situation worse, on October 2, 2017, a Kentucky jury awarded a plaintiff three and a half million dollars ($3.5 million) in actual damages and twenty-five million dollars ($25 million) in punitive damages against one of the Preferred Care Group entities and all of the Management Debtors. The judgment defendants filed a motion for judgment notwithstanding the verdict, which is pending as of the Petition Date.

E.   *Capital Structure and Debt Summary*

19. Following the corporate reorganization that began in 2008 and was completed over the past several months, the Management Debtors ceased to have any ordinary course payment obligations. Such obligations were all assumed by MCON and other non-debtor affiliates described above. The vast majority of the claims asserted against the Debtors arise from the litigation in Kentucky and New Mexico summarized above, where the Debtors are co-defendants with several of the Preferred Care Group entities. Such claims are all disputed, unliquidated and contingent. As of the Petition Date, there had been only one jury verdict entered, which was not yet final under applicable Kentucky state law.

20. The Debtors have no secured debt outstanding as of the Petition Date.[7] Thus, there is no third-party or other secured lender in these Cases, and the Management Debtors are not obligated on any of the Preferred Care Group's secured loan facilities.

21. Similarly, the Debtors have no ordinary course priority obligations.[8] With respect to any tax and employee-related obligations, MCON has assumed all such ordinary obligations,

---

[7] Prior to the Petition Date, the Debtors used a line of credit with Compass Bank, secured by certain accounts receivable. However, such line of credit matured in April, 2017, and was not renewed. Accordingly, at the time of the corporate restructuring in July, 2017, and as of the Petition Date, the Debtors no longer owe any obligations to Compass Bank or any other secured lender.

[8] Management has received a Notice of Claim of Tax Lien from the New Mexico Department of Taxation and Revenue, but such claim is based on a disputed theory of successor liability. The Debtors continue to dispute any liability for the previous owner or operator's taxes in New Mexico.

including any ad valorem personal property taxes or employee withholding obligations for calendar year 2017.

F.     *Goal of the Bankruptcy Cases and Proposed Plan of Reorganization*

22.    The primary goal of these Cases is to maximize a recovery for the Debtors' legitimate creditors without hindering the operations of the Facilities or unwinding the corporate reorganization that was completed in the preceding months. The Debtors also lack the financial resources to satisfy the judgment recently entered in Kentucky, or to continue defending the other 160+ lawsuits pending throughout the United States. The bankruptcy forum will provide the Debtors with a breathing spell and an opportunity to negotiate with the plaintiffs (most of whom are represented by only a few law firms), and attempt to negotiate a global settlement without disrupting the operations at the Facilities, negatively impacting the well-being of the Facilities' residents or inhibiting the Preferred Care Group's ability to enter into future transactions to sell or otherwise dispose of any Facilities.

## II.    FIRST DAY MOTIONS

23.    To ensure the speedy and efficient administration of these Cases, and to preserve and maintain the value of the Debtors as a going concern, the Debtors have also filed a number of so-called first-day motions (the "First-Day Motions"), as more fully discussed below:

B.     *Joint Administration.*

24.    The Debtors' primary creditors comprise the 160+ plaintiffs, including the judgment creditor in Kentucky who recently obtain a $28 million verdict against the Debtors and certain Preferred Care Group entities. All such creditors have asserted joint and several liability against the Debtors and certain of the unaffiliated Preferred Care Group entities. I believe that joint administration of the Debtors' Cases is appropriate because the Debtors intend to file with this Court numerous motions and applications to effect a smooth process for the business during

the bankruptcy and a rapid exit via a confirmed plan. As such, the joint administration of these cases, including the combining of notices to creditors of the respective estates, as well as the notices and hearings of all matters at the same time, including, without limitation, motions and adversary proceedings, will promote the economical, efficient, and convenient administration of the Debtors' estates. Separately administering the Cases of the multiple Debtors, each with its own case docket, would result in duplicative pleadings repeatedly being filed. I believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court. I also believe that parallel, partially duplicative, yet separately administered Cases would also risk confusing and possibly prejudicing or harming the interests of creditors and parties-in-interest. As such, the Debtors have requested the administrative consolidation under Bankruptcy Rule 1015(b).

C.   *Complex Case Designation.*

25.   The Debtors have also filed a *Notice of Designation as Complex Chapter 11 Bankruptcy Cases*, which I understand from my counsel is in accordance with the General Orders of the Court when commencing the contemplated complex cases. I believe this designation is warranted because (a) the total claims asserted against the Debtors (while largely, if not entirely, disputed) exceed the $10 million threshold; (b) there are over 50 creditors and parties in interest in these Cases; and (c) there are multiple Debtors involved. Based on these factors, as well as the impact between these Cases and those filed by the Preferred Care Group entities, I believe the Debtors are entitled to complex chapter 11 case treatment of their Cases, which will allow the Debtors and their bankruptcy counsel to use a limited service list, and set hearings on a more frequent basis. I believe such treatment will help the Debtors complete an effective and efficient restructuring through these Bankruptcy Cases without incurring unnecessary administrative costs or prejudicing the interests of creditors or parties-in-interest.

D.   *Cash Management Motion.*

26.   The Debtors have also filed a motion to authorize them to continue using their existing bank accounts and cash management system (collectively, the "Cash Management System"). As discussed in greater detail in the Cash Management Motion, the Debtors do not maintain any significant cash in their bank accounts. Instead, the Debtors and the non-debtor special purpose affiliate entities have entered into separate agreements with non-debtor affiliate MCON, through which MCON manages the affiliates' cash, pays expenses and receives a management fee sufficient to cover MCON's own expenses.

27.   The Cash Management System is centrally administered and includes, among other things, centralized forecasting, reporting, fund collection, and funds disbursement functions. As described in more detail below, substantially all of the Debtors' funds are generally held in MCON's operating account, subject to treasury and accounting functions performed by MCON to account for money owed to or from the Debtors and other non-debtor affiliates. The principal components of the system are described as follows:

   a)   MCON Operating Account, Origin Bank Account #8394 – This is the account where substantially all of the Debtors' and non-debtor affiliates' funds are maintained, subject to agreements with the MCON's Debtor and non-debtor affiliates. Upon the Preferred Care Group's payment of management fees from the Facilities, the funds are deposited into this MCON Operating Account, and the manager entities entitled to those fees receive the corresponding credits. The remaining deposits are then booked as management fees for MCON, and are generally sufficient to pay MCON's operating expenses. In general, MCON does not earn a profit on the fees collected from the Facility management fees.

   b)   MCON Payroll Account, Origin Bank Account #3611 – This is the account held in the name of MCON where MCON funds payroll and related obligations to its employees and payroll administrators.

   c)   MCON AP Account, Origin Bank Account #3554 – This is the account held in the name of MCON where moneys are deposited to fund day to day expenses for the Debtors and non-debtor affiliates whose cash MCON is managing.

d) <u>MCON HRA Account, Origin Bank Account #9993</u> – This account is maintained by MCON with this assistance of a third-party employee benefits administrator. Through this third-party plan administrator, MCON provides occasional rebates for certain employees through this account when the employees qualify by paying a pre-established amount of the employees' healthcare plan deductible within a given plan year. The account balance is generally maintained at or near a $0.00 balance, except when the third-party administrator advises MCON that an employee has qualified for the rebate. In such an event, MCON funds the appropriate rebate(s) into this account, which are then paid to the employee out of this account, returning the account balance to $0.00.

e) <u>Management, Origin Bank Account #9170</u> – This is a general purpose bank account held in the name of Preferred Care Partners Management Group, L.P. There has been no activity out of this account, since any payments required to be made on behalf of Management are actually made by MCON. When MCON makes payments on behalf of Management, it immediately books a debit in its entries reflecting that the cash held for the subject to debit accounting entries, reflecting a reduction to the funds held by MCON for the benefit of Management. .

f) <u>KPM, Origin Bank Account #9247</u> – This is a general purpose bank account previously used by KPM. Since KPM's management agreements expired on June 30 2017, the Debtors discontinued their use of this account shortly thereafter. As of September 30, 2017, KPM held approximately $2,959.00 in this account.

g) <u>PCPMG, LLC, Origin Bank Account #5701</u> – This is a general purpose bank account previously used by PCPMG, the general partner of Management. There has been no activity out of this account other than transferring funds into the account when the Debtors moved their banking from Compass Bank to Origin Bank. Any payments required to be made on behalf of PCPMG are actually made by MCON, subject to debit accounting entries to reduce the money owed by MCON to PCPMG..

h) <u>PCPMG-ICF, LLC, Origin Bank Account #0714</u> – This is a general purpose bank account previously used by PCPMG-ICF, the manager of approximately five (5) intermediate care facilities owned and operated by the Preferred Care Group. There has been no activity out of this account other than transferring funds into the account when the Debtors moved their banking from Compass Bank to Origin Bank. Any payments required to be made on behalf of PCPMG-ICF are now made by MCON, subject to debit accounting entries to reduce the money owed by MCON to PCPMG-ICF.

28. While the Debtors no longer maintain employees or operations, Management is entitled to receive declared distributions from the fees derived by its wholly-owned subsidiaries, based on the net profits earned by each of the special purpose entities and deposited in the MCON Operating Account as described in Paragraph 27(a) above. Since the corporate restructuring in July, 2017, the special purpose entities have declared distributions on a monthly basis. In the time between July 1, 2017, and the Petition Date, Management has averaged approximately $304,000.00 per month in distributions from its wholly-owned special purpose entity subsidiaries.

29. The Cash Management System procedures the Debtors use constitute an ordinary, usual, and essential business practice and are consistent with those used by other similar enterprises in the industry, including the Preferred Care Group. The cash management system provides significant benefits to the Debtors, including but not limited to the ability to (a) trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable; (b) control corporate funds centrally; (c) minimize idle cash; and (d) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance presentment information.

30. I have been advised that upon the filing of these bankruptcy cases, the ordinary procedure is to close all preexisting bank accounts at unauthorized depositories and reopen new debtor-in-possession bank accounts at authorized depositories. The Debtors can do this, although doing so will not alter the flow of funds through the Cash Management System, since the vast majority of the cash flows through non-debtor MCON's bank accounts, as described above. Similarly, Management does not have the account staff necessary to maintain and account for the management fees received, and attendant expenses incurred, by Management's

subsidiaries. Given that the management operations of the Debtors' affiliates will continue outside of the bankruptcy proceedings, the benefits of allowing MCON—a wholly owned subsidiary of Management—to manage the Debtors' cash clearly outweigh any risks associated with such cash being managed by a non-debtor affiliate. The Debtors are unlikely to have many post-petition ordinary course expenses requiring payment during the bankruptcy proceedings, other than bankruptcy-related expenses. Thus, during the course of these bankruptcy cases, the cash maintained by MCON for the benefit of Management is only likely to accrue, not depreciate.

31. To alleviate any concerns, I will work with Debtors' professionals to provide any reporting that the Court or the United States Trustee might require to show the flow of funds through MCON but belonging to Management and any other Debtor affiliates. Specifically, the Debtors will continue to maintain records of such accountings, including records of all current intercompany accounts receivable and payable, with balances existing as of and following the Petition Date.

E.  *Extension of Schedules & SOFA Deadlines Motion*

32. The Debtors and their advisors are preparing the Debtors' schedules of assets, liabilities, executory contracts, and unexpired leases (collectively, the "Schedules") and statements of financial affairs (the "SOFA"). While the Debtors may not require an extension, the substantial size and complexity of the Debtors' pre-reorganization enterprise and the vast numbers of plaintiffs complicates the Debtors' ability to assemble and compile such information within the first 14 days of the Petition Date. There is limited staff available to review and compile such information and these personnel must also devote a substantial portion of their time and attention to business operations during the first critical weeks of these Chapter 11 Cases in order to maximize the value of the Debtors' estates. The Debtors will make a good faith effort to

complete their respective Schedules and SOFAs as soon as reasonably practicable, and with the intention of compiling and assembling such information in a sufficient amount of time before the 341 Meeting of Creditors in these Cases.

F. *Debtors' Professionals*

33. In addition to the foregoing, although not filed as "first day" motions, the Debtors are also seeking to employ professionals to assist with these Bankruptcy Cases. For legal counsel, the Debtors propose to retain Dykema Cox Smith as their general bankruptcy counsel under § 327(a) of the Bankruptcy Code. Finally, to the extent necessary, the Debtors may seek to employ ordinary course professionals, including MCON and/or certain of its employees, to assist the Debtors in preparing schedules, statements of financial affairs, monthly operating reports, and any other data needed during the course of the Bankruptcy Cases. Applications will be filed contemporaneously with or immediately following the First Day Motions, and the Debtors will seek hearings on such applications in a timely manner, after a sufficient time for objections.

### III. CONCLUSION

34. For the reasons provided above, I respectfully submit that the First Day Motions and all other just and proper relief should be granted.

[Remainder of this page intentionally left blank; signature to follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, on this 13th day of November, 2017.


          */s/ Travis Eugene Lunceford*
          Travis Eugene Lunceford